IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| Wanzek, a MasTec Company, | ) | |
| | ) | Case No. 3:11-cv-94 |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| -vs- | ) | **ON MOTIONS FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Allstate Tower, Inc., a Foreign Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## I. INTRODUCTION

Before the Court are the parties' cross motions for summary judgment (Docs. #16 & 21). On December 11, 2009, a cellular tower located in Fergus Falls, Minnesota broke apart as it was being dismantled, damaging Plaintiff Wanzek, a MasTec Company's (hereafter "Wanzek") crane.  Wanzek seeks to recover repair costs for the crane and rental costs for substitute cranes from Allstate Tower, Inc. (hereafter "Allstate").  The Court, having carefully considered the arguments of the parties, now issues this memorandum opinion and order.

## II. SUMMARY OF DECISION

In order for Wanzek to prevail on its breach of contract claim, it must show Allstate, as the principal, intentionally or by want of ordinary care caused Wanzek to believe SiteTech was Allstate's agent when SiteTech rented the crane from Wanzek.  Argabright v. Rodgers, 659 N.W.2d 369, 371 (N.D. 2003).  There is contradictory evidence in the record on whether Allstate's conduct could cause a reasonable fact finder to conclude SiteTech was acting as an ostensible agent of Allstate.  Genuine issues of material fact preclude summary judgment on

1

Wanzek's breach of contract claim.

Wanzek has failed to present sufficient evidence or disputed facts in order to meet the requirements necessary for its negligence claims.  Thus, Allstate is entitled to summary judgment on these claims.

### III. RELEVANT FACTS

In late 2009, Charter Communications wanted a 550-foot guyed cellular tower located in Fergus Falls, Minnesota dismantled and removed from the site (Doc. #17-1, Dep. Walker, p. 9; Doc. #17-4, Attachment "A" to Master Subcontract Agreement).  Charter Communications contracted with Allstate Tower, Inc. ( "Allstate") for the removal of the tower.  Allstate subcontracted with Sundance Group Inc./ SiteTech Wireless Division (hereafter "SiteTech")[1] to perform the following work:

1. Mobilize to tower site.
2. Dismantle (1) 550' guyed tower with gin pole and haul off site for disposal.
3. Cut anchor rods 1'below grade, base pier to remain.

(Doc. #17-4).  Under the terms of the subcontract, SiteTech was responsible for providing the labor, tools, equipment, gin pole, and offsite disposal.  Id.  Allstate agreed to pay SiteTech a lump sum of $19,000 for completion of the work.  Id.  SiteTech kept Allstate, whose principal place of business is Henderson, Kentucky, apprised of the project's progress through a series of emails, pictures, and telephone calls (Doc. #17-3, Dep. Calandros p. 68; Doc. #17-1, Dep. Walker pp. 39-41).

---

[1] Sundance Group, Inc. and SiteTech were separate companies that teamed together in 2007 with the purpose of engaging in the cellular tower business (Doc. #17-2, Young dep. pp. 9-10, 13-14). Sundance Group was going to manage the office and SiteTech was to perform the field work.  Id.  The relationship deteriorated rather quickly and it appears that SiteTech was the sole company responsible for the work on this project.

The particular project involved the use of a gin pole to dismantle the tower.  A gin pole resembles a tower with a large winch (Doc. #17-1, Dep. Walker, p. 17).  Steel cables and pulleys are used to pull the gin pole up the tower.  Id.  Once in place, approximately 20 feet of the tower's top is unbolted and lowered to the ground with the winch.  The gin pole is then relocated to the tower's next highest section and the process is repeated.  Id.  As the tallest affordable cranes only reach to a height of approximately 300 feet, a gin pole is necessary to reduce a tower's height until a crane can access and remove the remaining portion of the tower (Doc. #17-1, Dep. Walker p. 18).  SiteTech estimates that a crane with a 500 foot boom costs about $60,000 a day to rent (Doc. #17-3, Dep. Calandros p. 71).  A crane with around a 300 foot boom costs about $15,000 a day to rent.  Id.

SiteTech used a gin pole to remove the top 180 feet of the 550 foot tower.  Given that the tower was now approximately 370 feet tall, SiteTech decided to use a crane to remove the remaining tower (Doc. #17-3, Dep. Calandros pp. 13, 149).  Michael Calandros, who was employed by SiteTech as the project manager/foreman, testified that his boss at SiteTech told him to "call in a crane."  Id. at 13.  Calandros approved of the plan, as it was very cold outside, it was taking a longer time to remove the sections because of the cold, and his crew was complaining about the cold.  Id. at pp. 16, 71.  SiteTech notified Allstate by telephone of the stage of the work and that they were going to rent a crane to complete the project (Doc. #17-1, Dep. Walker p. 109).  Allstate did not jointly or separately rent the crane.  Id. at p. 108.

SiteTech entered into a Crane Service Work Order Agreement ("the Agreement") with Wanzek for the crane rental along with a trained crane operator.  Calandros signed the Agreement on behalf of SiteTech.(Doc. #17-3, Dep. Calandros p. 149).  Allstate's name is

3

handwritten on the Agreement next to the term "Company", as indicated below:

Calandros testified that "Allstate Tower" was included on the Agreement because SiteTech did

not have sufficient credit to rent a crane.  Id. at p. 185.  Allstate denies that it ever authorized the

rental of the crane through the use of its credit.  Wanzek, on the other hand, asserts it understood

Allstate would be responsible if there were any problems (Doc. #24, Aff. Kevin McCrory ¶ 4).

Wanzek avers SiteTech employees represented that SiteTech had the authority to sign the rental

agreement on behalf of Allstate.  Id. at ¶ 10.  Regardless of Wanzek's assertions, only SiteTech is

listed in the section of the agreement entitled "CUSTOMER ACCEPTANCE AND AUTHORIZATION OF

CRANE SERVICE."  There is nothing in the written contract to indicate that Allstate ever accepted

4

or authorized the crane rental.

The record contains contradictory information about who paid Wanzek.  Wanzek avers that it expected to be paid by Allstate (Doc. #24, Aff.  McCrory ¶ 11). SiteTech contends Allstate paid Wanzek and then Site Tech reimbursed Allstate for the crane rental (Doc. #17-3, Dep. Calandros p. 149).  Allstate asserts it did not pay for the crane rental, as the subcontract required SiteTech to pay for all equipment needed for the project (Doc. #17-1, Dep. Walker p. 109).  No invoice, cancelled check, or other affirmative evidence is in the record to resolve this dispute.

Wanzek delivered and set up the crane at the site (Doc. #17-3, Dep. Calandros p. 10).  SiteTech attached the tower to the crane according to the crane operator's instructions.  Id.  at pp. 18-20.   The crane operator directed the SiteTech crew to use Wanzek's cables to attach the tower to the crane.  Id.  at pp. 10, 19.  SiteTech put the cables "right where he [the crane operator] wanted them because he knew his hook height and everything."  Id. at p. 19.  SiteTech estimated that the remaining tower sections weighed approximately 12,000 pounds, which was well within the crane's weight capacity of 26,000 pounds.  Id. at p. 17.

Wanzek's crane operator picked up the load and the SiteTech crew cut the guy wires and disconnected the tower from the base.  The crane operator lifted the tower off the ground and moved it 180 degrees from the base, as planned.   At this point versions of what happened diverge.  SiteTech claims the crane operator panicked while the crane was flexing, stopped the load, and caused the tower to begin "snapping."  Id. at pp. 10, 16-18.  SiteTech denies all responsibility for the tower's collapse.  Rather, SiteTech asserts the crane operator  "shocked the load [and] he broke [the tower] all to pieces."  Id. at pp. 13, 18.  Calandros testified that he has been in the tower removal business for 25 years, removed hundreds of towers using a gin pole,

5

and has only had one other tower break during the removal process - both times because the crane operator suddenly stopped movement of the tower and "shocked" the load.  Id. at pp. 11, 18, 68.

Wanzek denies this version of events.  Its retained structural engineer opines that the tower broke apart because it of its size at the time it was moved (Doc. #23-1).  The engineer believes the tower, during the lowering process, would have behaved as intended by the original designer if it was removed in 100 foot sections rather than a single 300 foot section.  Id.  Wanzek contends the loss was occasioned by a bad plan, rather than bad crane operation.

Wanzek alleges it sustained damages consisting of: (1) $219,244.26 to repair the crane; (2) $76,950.00 to rent replacement cranes from January through March 2010; and, (3) $2,528.89 to tear down the damaged crane onsite (Doc. #23-2).  Wanzek alleges Allstate is obligated to pay for the damages under the terms of the Crane Service Work Order Agreement because at the top of the Work Order, both SiteTech and Allstate are listed on the line next to the term "Company." (Doc. #17-6, Crane Work Order, p.1).   The Agreement contains an indemnification clause, which provides:

> To the fullest extent permitted by law, Customer agrees to indemnify and save Wanzek, its employees and agents, harmless from all claims, loss, damage or injury to . . . property including without limitation the crane . . . regardless of any negligence or fault of Wanzek or the crane operator or a defect or failure in the crane. Customer's duty to indemnify shall include all costs and expenses associated with the foregoing, including without limitation all court and/or arbitration costs, costs of investigation, attorney fees and costs of settlement . . . .

Wanzek contends that even though Allstate did not sign the Agreement, it is still liable because SiteTech was acting as Allstate's authorized agent.  Allstate disputes the existence of an agency relationship and further contends it has no liability because SiteTech exclusively accepted

6

and authorized the crane service without Allstate's approval.

In the alternative, Wanzek alleges liability based on Allstate's negligent business practices. The alleged negligent business practices include negligent hiring, supervision, and exercise of control over a subcontractor. Allstate claims no duty existed to either supervise or exert control over SiteTech because SiteTech was an independent contractor, and even if there was a duty, it did not breach its duty to exercise due care.

### IV. Issues

The parties raise a number of issues in their summary judgment motions:

(1)     Whether Allstate is contractually obligated to indemnify Wanzek for its damages because SiteTech was an agent of Allstate.

(2)     Whether North Dakota or Minnesota law applies to Wanzek's tort claims.

(3)     Whether Wanzek has a cognizable claim for breach of a duty of care for failing to supervise SiteTech.

(4)     Whether Wanzek has a cognizable claim for negligence in failing to employ a competent and careful contractor.

(5)     Whether Wanzek has a cognizable claim because the removal of the tower was inherently dangerous work.

### V. Discussion

## I.     Applicable Procedural Law

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish the basis for its motion. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). Evidence must be viewed in the light most favorable to the nonmoving party, and the

nonmoving party enjoys the benefit of all reasonable inferences to be drawn from the facts.

Quinn v. St. Louis County, 653 F.3d 745, 750 (8th Cir. 2011).  If the moving party shows there

are no genuine issues of material fact, the burden shifts to the non-moving party to set forth facts

showing a genuine issue for trial.  Donovan, 289 F.3d at 529.

## II.      Applicable Substantive Law

### A.      Breach of Contract Claim

Both parties agree that the choice-of-law clause in the Crane Service Work Order

Agreement (Doc. # 17-6) demands that North Dakota law governs the breach of contract claim.

For a breach of contract claim, the forum selection clause is "presumptively valid and should be

enforced unless such enforcement is shown to be unreasonable or unjust or the clause is shown to

be invalid because of fraud or overreaching."  KaeRen Accomodations, Inc. v. Country

Hospitality Corp., 243 F.Supp.2d 993, 995 (N.D. 2002).  Neither party has made a claim that the

choice-of-law provision is invalid.  Assuming Allstate is liable under the terms of the contract

between Wanzek and SiteTech, North Dakota law will govern such a claim.

(1)      Whether Allstate is contractually obligated to indemnify Wanzek for its
damages because SiteTech was an agent of Allstate.

Wanzek contends SiteTech was an agent of Allstate, and as such, Allstate is liable for

SiteTech's actions.  "An agency relationship results when one entity, called the principal,

authorizes another entity, called the agent, to act for the principal in dealing with third parties."

Stockman Bank of Montana v. AGSCO, Inc., 728 N.W.2d 142, 148 (N.D. 2007) (citing N.D.

CENT. CODE § 3-01-01).  Agency is either actual or ostensible.  N.D. CENT. CODE § 3-01-03

(2011).  Actual agency exists when the agent truly is employed by the principal.  Id.  An

ostensible agency exists when "the principal intentionally or by want of ordinary care causes a third person to believe another to be his agent, who really is not employed by him." Argabright v. Rodgers, 659 N.W.2d 369, 371 (N.D. 2003).

There is no evidence to suggest an actual agency relationship existed between SiteTech and Allstate. Analysis is thus limited to the existence of an ostensible or apparent agency, with the focus on whether SiteTech had actual or implied authority to bind Allstate to the rental contract.  The existence of an ostensible agency is determined by "conduct or communications of the principal which, reasonably interpreted, causes a third person to believe that the agent has authority to act for and on behalf of the principal. Id.  An agency relationship is never presumed, and Wanzek has the burden of proving the existence of an ostensible agency relationship by clear and convincing evidence.  Id. at 372.

Wanzek points to the following factors to support its assertion of an agency relationship. First, it notes Allstate's name is written on the Crane Service Work Order Agreement, (Doc. #17-6), and it points to N.D. CENT. CODE § 3-03-04, which states that "[a]ny instrument within the scope of the agent's authority by which an agent intends to bind the agent's principal does bind the principal if such intent is plainly inferable from the instrument itself."  Second, Wanzek's employee, Kevin McCrory, has submitted an affidavit indicating, at the time of the rental agreement, Wanzek relied upon representations from SiteTech that Allstate would be ultimately responsible.  McCrory avers that he would not have rented to a company like SiteTech, which had an insufficient credit rating and history to qualify for the rental, if Allstate's name was not on the contract.  Third, Wanzek claims Allstate had a system whereby it would allow subcontractors to use its name to rent equipment, and because Allstate never demanded repayment from

SiteTech for the crane rental, and did not "black-list" SiteTech, i.e. prevent SiteTech from using Allstate's name to authorize future rentals for future projects is evidence that Allstate ratified SiteTech's authority to rent the crane.

Allstate directs the Court to the testimony of Mike Calandros (SiteTech) who testified that he signed the rental agreement on behalf of SiteTech alone.  Calandros also testified the name "Allstate" was added to the Crane Service Work Order Agreement after he had signed it.  Allstate also points to a second location on the Agreement where only SiteTech is listed as the customer.  Allstate denies it authorized SiteTech to rent the crane.  Allstate concedes it was informed of the crane rental, but states it was not in a position to give or withhold permission for SiteTech to do so, as SiteTech was responsible under the subcontract to provide the tools and equipment needed to complete the project.  Allstate acknowledges that sometimes subcontractors use Allstate's name to rent equipment without its permission, and that Allstate has paid directly for such rentals to keep its own credit in good standing.  Allstate then recovers the money on the next project with the subcontractor.

Both parties allude to the Crane Service Work Order Agreement as either supporting or disproving the existence of an agency relationship.  Allstate's name on the document provides some evidence that Wanzek was under the impression that Allstate agreed to be responsible for the contract, but it is not proof of agency on its own because it is Allstate's conduct that will determine whether an agency relationship exists.  It is indisputable that SiteTech and Wanzek were the only parties actually present at the signing of the contract.  Contrary to some of the arguments made by Wanzek, it is the principal's conduct that determines whether an agency relationship existed, not the agent's conduct.  On the record before the Court either SiteTech or

Wanzek could have placed the name "Allstate" on the contract.  No one has asserted that Allstate ever contacted Wanzek directly and authorized its inclusion on the written agreement.  Indeed, nothing in the record reflects that Allstate ever expressly authorized anyone to act on its behalf. The appearance of Allstate's name on the contract could have been placed on the rental agreement without the consent of the company.  Therefore, the rental agreement, itself, neither proves or disproves the existence of an agency relationship.

Looking to the other evidence pointed out by the parties, in attempting to resolve Wanzek's claim that SiteTech served as Allstate's agent, the Court believes at least four questions of material fact exist that need to be resolved by the fact finder: First, what exactly was said during in the phone conversation between Calandros (SiteTech) and Walker (Allstate) wherein Calandros informed Walker that he was going to rent the crane.  Did Allstate give oral permission in lieu of written permission for SiteTech to rent the crane and thus assented to the terms and conditions of the Agreement?   The subcontract agreement contains a clause forbidding assignment and subletting of the work:

> The SUBCONTRACTOR [Sitetech] will not assign this subcontract or sublet any work described in ATTACHMENT A of this MASTER SUBCONTRACT AGREEMENT without the prior written consent of the CONTRACTOR [Allstate]. All insurance requirements outlined in this document apply to any additional subcontractor's contracted with be the SUBCONTRACTOR [Sitetech].

(Doc. # 17-5, p. 6).   Whether the rental of the crane falls under this provision is debatable.  A crane appears to be a necessary tool for the project.  However, the rental of the crane requires a crane operator and work to be performed by others besides SiteTech employees.  Based on the evidence in the record, the Court is not in a position to resolve whether Allstate authorized the crane rental over the telephone.

Second, whether Allstate, expressly or impliedly, granted SiteTech permission to use its name as a source of credit and business history to facilitate the crane rental and thus assented to the terms and conditions of the Agreement.  There is some evidence in the record that Allstate was aware that subcontractors would rent equipment under its name.  After this project, Allstate is unaware of any conversations with SiteTech in which Allstate prohibited SiteTech from using its name in the future.  Whether this evidence is sufficient to determine SiteTech acted as an agent of Allstate on this project requires resolution by the fact finder.

Third, at the time of the rental, Wanzek asserts it believed SiteTech had the authority to sign the rental agreement on behalf of Allstate based on representations from SiteTech employees and thus Allstate would be ultimately responsible for any damages. This claim is supported by an affidavit from Wanzek. As an evidentiary matter, the affidavit is not particularly compelling.  It fails to identify what was said, by whom, when, under what circumstances, and how it actually influenced Wanzek to draw the conclusions it asserts.  This lack of specificity would tend to raise questions about its accuracy.  Moreover, this claim is contrary to other evidence in the record which seems to indicate that Wanzek sought to hold SiteTech responsible for all damages, with no claim being asserted against Allstate.[2]  Despite the dubious evidence presented by Wanzek, credibility is an issue for the ultimate finder of fact to consider.

Fourth, there is no documentary evidence in the record to establish who paid Wanzek. The lack of a record of the alleged payment transaction, results in a classic "he says-she says"

---

[2] When considering SiteTech's claim for damages, Wanzek wrote a letter to SiteTech's attorney, advising the attorney that Wanzek was holding SiteTech liable for "all damages to the crane." (Doc. #27-1).  It makes no mention about Allstate - the party Wanzek is now attempting to hold responsible for all of the damages.

dichotomy.  Wanzek asserts it understood Allstate was paying the bill.  Allstate denies paying the bill. SiteTech's evidence is ambivalent as it merely believes Allstate paid the bill and that it reimbursed Allstate.  None of the parties has produced an invoice, cancelled check, or EFT statement showing a payment trail.  If Allstate paid the bill, a fact finder may draw an inference that Allstate authorized the rental. A fact finder may also determine, based on all the evidence, that Allstate paid the bill in order to maintain its credit rating.  But, if Allstate did not pay the bill, no such inference of an agency relationship exists.

Resolution of these issues impact whether there was an ostensible agency relationship. Because the record is not fully developed and issues require resolution by the ultimate finder of fact, summary judgment on the breach of contract claim at this stage in the proceedings is denied.

### B.    Tort Claims

   (1)    Whether North Dakota or Minnesota law applies to Wanzek's tort claims.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (district court has jurisdiction over civil actions where the matter in controversy exceeds $75,000 and the plaintiffs and defendants are citizens of different states).  The threshold inquiry is which state's law should be applied to the tort claims in this diversity action.  Wanzek asserts that Minnesota law applies while Allstate seeks to apply North Dakota law.

Generally, the district court is to apply the choice-of-law rules of the forum state. Eggleton v. Plasser & Theurer Export Von Bahnbaumaschinen Gesellschaft, MBH, 495 F.3d 582, 585 (8th Cir. 2007).  The rationale for the rule is so that a defendant cannot defeat the advantages accruing to a plaintiff who has chosen a proper forum.  Id. at 586. North Dakota

follows a two pronged test:  first, the significant contacts which are logically connected to the

issues of the matter are identified; and second, Leflar's five choice-influencing factors are

applied to the relevant contacts "to determine which jurisdiction has the more significant interest

with reference to a particular issue."  Daley v. American States Preferred Ins. Co., 587 N.W.2d

159, 162-63 (N.D. 1998).

The test's first prong mirrors the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145,

which provides

> (1) The rights and liabilities of the parties with respect to an issue in tort are
> determined by the local law of the state which, with respect to that issue, has the most
> significant relationship to the occurrence and the parties under the principles stated
> in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine
> the law applicable to an issue include:
>
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the injury occurred,
>> (c) the domicile, residence, nationality, place of incorporation and place of
>> business of the parties, and
>> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect
> to the particular issue.

The second prong takes the contacts established in the first prong, and analyzes them with

the following goals in mind: (a) predictability of results; (b) maintenance of interstate and

international order; (c) simplification of judicial task; (d) advancement of the forum state's

governmental interests; and (e) application of the better rule of law.  Robert A. Leflar, Choice-

Influencing Considerations in Conflicts Law, 41 N.Y.U.L.Rev. 267, 282 (1966).

*a.   the relevant contacts*

Wanzek identifies the location of the injury - Fergus Falls, Minnesota - as the most important contact.  Wanzek identifies the other relevant contacts as the businesses' states of incorporation: Wanzek in North Dakota, SiteTech/Sundance in Tennessee, and Allstate in Kentucky.

Allstate relies on the following contacts: Wanzek is a North Dakota company, Wanzek chose to file suit in the District of North Dakota, and the choice-of-law provision in the Crane Service Work Order Agreement. In addition, the Agreement was entered into in North Dakota. The Agreement's choice-of-law provision states:

> This Agreement shall be construed in accordance with and governed by the laws of the State of North Dakota.  Whenever possible, each provision of this Agreement will be interpreted to be operative and valid under applicable law.  If any provision of this Agreement is prohibited by or invalid under applicable law, the provision will be ineffective only to the extent of the prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this Agreement.

(Doc. # 17-6, Crane Work Order, p. 2).

Reliance on the choice-of-law provision is problematic for Allstate. Allstate's primary defense in this case is that it is not a party to the Agreement and it did not authorize SiteTech to bind it to the terms of the Agreement.  But, assuming, *arguendo,* that Allstate is bound by the terms of the Agreement, there are other problems with relying on this contact.  First, the two-pronged choice of law analysis is, in fact, an application of North Dakota law.  Second, the plain language of the choice-of-law clause clearly limits its application to the provisions of the Agreement itself.  Tort claims are outside the provisions of the Agreement, and are, therefore, subject to standard analysis for choice of laws. Inacom Corp. v. Sears, Roebuck and Co., 254

F.3d 683, 687 (8th Cir. 2001) (concluding that the choice-of-law provision in an agreement between the parties was only effective for disputes directly related to the provisions of the agreement).

Having identified all relevant contacts, the significance of the contacts are to be measured by examining Leflar's five choice-influencing factors. Daley, 587 N.W.2d at 164.

### b.  Leflar's choice influencing considerations

Wanzek believes the considerations favor application of Minnesota law.  Allstate disagrees, asserting North Dakota law applies to the tort claims.  The Court has analyzed each factor below, and finds this is a very close case.

### 1.  Predictability of Results

"Predictability of results includes the ideal that parties to a consensual transaction should be able to know at the time they enter upon it that it will produce, by way of legal consequences, the same socioeconomic consequences ... regardless of where the litigation occurs[.]" Daley, 587 N.W.2d at 164 (quoting Robert A. Leflar, American Conflicts Law, § 103, at 290).  This consideration is important in transactions where the parties are likely to have given advance thought to the legal consequences of their conduct.  Nodak Mut. Ins. Co. v. Wamsley, 687 N.W.2d 226, 232 (N.D. 2004).  The primary objective of the predictability factor is thus to fulfill the parties' justified expectations.  Id.

Neither Allstate nor Wanzek are Minnesota companies; however, they both do business in Minnesota.  Allstate contends this factor is of little importance because it did not enter a consensual transaction with Wanzek.  Allstate's point is well-taken but it is not the end of the

analysis.  Based on the record before the Court, it appears SiteTech made the decision to rent a crane and selected Wanzek as the company from which it would rent the crane.  There is a dispute as to whether SiteTech assumed the role of agent for Allstate when the crane was rented.  Even so, Allstate was aware that the project was located in Minnesota and Minnesota is the place where the injury occurred.

North Dakota has abandoned the *lex loci delicti* (law of the place where the wrong occurred) doctrine.  Albeit in the context of automobile insurance policies, the North Dakota Supreme Court has determined that the location of the injury is not a sufficient contact to require application of that state's law in the absence of other interests or contacts.  Wamsley, 687 N.W.2d at 232.  However, the comments to the Restatement (Second) of Conflict of Laws continue to note that the location of the injury, while not the exclusive consideration, remains an important consideration in a choice-of-law analysis.  Comment e states:

> "[t]he fact, for example, that one of the parties is domiciled or does business in a given state will usually carry little weight of itself. . . . In the case of personal injuries or of injuries to tangible things, the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law."

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, cmt. e.  Comment f also indicates "[t]he relative importance of the contacts . . . varies somewhat with the nature of the tort involved.  Thus, the place of injury is of particular importance in the case of personal injuries and of injuries to tangible things."  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145, cmt. f.  Likewise, the United States Supreme Court has noted within the last few years that "[t]he location of injury continues to hold sway in choice-of-law analysis in tort cases."  J. McIntyre

Mach., Ltd. v. Nicastro, 131 U.S. 2780, 2800 n.11 (2011).

This case presents a close question.  Wanzek is a North Dakota corporation.  The Agreement at issue was entered into North Dakota.  Wanzek chose to file suit in the District of North Dakota.  Wanzek, however, seeks to apply Minnesota law because it is more favorable in terms of the joint and several liability of multiple tortfeasors. At the other end of the spectrum, the place of the injury is not a fortuitous event.  Allstate contracted with a company to remove a tower located in Minnesota.  The injury occurred in Minnesota.  The Court finds the justified expectations of the parties tips slightly in favor of application of Minnesota law.

### 2.   *Maintenance of Interstate and International Order*

When resolving conflict of law questions, courts "should seek to further harmonious relations between states and to facilitate commercial intercourse between them."  Plante v. Columbia Paints, 494 N.W.2d 140, 143 (N.D. 1992) (quoting Apollo Sprinkler Co., Inc. v. Fire Sprinkler Suppliers & Design, Inc., 382 N.W.2d 386, 389 (N.D. 1986)).  The goal of choice-of-law rules is to further harmonious relations between states, facilitate commerce between states, and avoid interstate friction.  Apollo Sprinkler Co., 382 N.W.2d at 390.

The party sustaining the alleged damages in this case is a North Dakota corporation, who is seeking application of Minnesota law because the events giving rise to the incident happened in Minnesota.  Under the circumstances, application of either state's law would not "manifest disrespect for [the other state's] sovereignty."  Daley, 587 N.W.2d at 164-65.  This consideration favors application of neither state's law.

### 3. *Simplification of the Judicial Task*

The usual view is that it is "easier for the forum court to apply its own law than any other." Wamsley, 687 N.W.2d at 233(quoting Plante, 494 N.W.2d at 143).  While Minnesota and North Dakota treat the law on comparative fault differently, there is no particular difficulty in applying the substantive law of North Dakota or Minnesota.  This factor does not favor either state's law.

### 4. *Advancement of the Forum State's Interest*

The state whose interests are most deeply affected should have its law applied.  Apollo Sprinkler Co.,Inc., 382 N.W.2d at 391.  "A state's governmental interest in a choice-of-law case is discoverable by (a) identifying the factual contacts which the litigated transaction had with that state, then (b) determining whether those contacts give rise to real reasons (socioeconomic or political justifications) for applying the state's law to litigated issues in the case." Wamsley, 687 N.W.2d at 234 (citations omitted).

North Dakota is the state of incorporation for Wanzek.  Wanzek commenced this action in the District of North Dakota.  The contract at issue was executed in North Dakota.  Other than these factors, the other relevant contacts took place in Minnesota.  Applying the protections afforded by North Dakota law "whenever North Dakota has any contacts with a controversy, however, is the kind of 'chauvinistic parochialism[,]' sought to be avoided by modern choice-of-law analysis." Plante, 494 N.W.2d at 143 (quoting Robert A. Leflar, The Nature of Conflicts Law, 81 Col.L.Rev. 1080 (1981)).  Because the forum state has slightly more limited contacts, this factor favors application of Minnesota law.

5. *Better Rule of Law*

The final consideration is whether North Dakota or Minnesota has, in an objective sense, the better rule of law.   Daley, 587 N.W.2d at 165   "Better" in this context means the rule that makes "good socio-economic sense for the time when the court speaks." Id. (quoting Leflar, Conflicts of Law: More on Choice Influencing Considerations, 54 Cal. L. Rev. 1584, 1588 (1966)).

While both North Dakota and Minnesota have relied on many of the same provisions of the RESTATEMENTS (SECOND) OF TORTS, they have different laws with respect to joint and several liability.  Minnesota has a joint liability statute, which provides:

> **Subdivision 1.  Joint liability.**  When two or more persons are severally liable, contributions to awards shall be in proportion to the percentage of fault attributable to each, except that the following persons are jointly and severally liable for the whole award:
>
> (1) a person whose fault is greater than 50 percent;
>
> (2) two or more persons who act in a common scheme or plan that results in injury;
>
> (3) a person who commits an intentional tort; . . .

Minn. Stat. § 604.02 (2003).  In contrast,  North Dakota does not recognize joint liability.  Under North Dakota law, the liability of each party is several only, and based on a percentage of fault. The exception is for parties who have acted in concert:

> Contributory fault does not bar recovery in an action by any person to recover damages for death or injury to person or property unless the fault was as great as the combined fault of all other persons who contribute to the injury, but any damages allowed must be diminished in proportion to the amount of contributing fault attributable to the person recovering. The court may . . . direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each person, whether or not a party, who contributed to the injury. . . . *When two or more parties are found to have contributed to the injury, the*

*liability of each party is several only, and is not joint, and each party is liable only for the amount of damages attributable to the percentage of fault of that party, except that any persons who act in concert in committing a tortious act or aid or encourage the act, or ratifies or adopts the act for their benefit, are jointly liable for all damages attributable to their combined percentage of fault. . . .*

N.D.Cent.Code § 32-03.2-02 (emphasis added).

Thus, under Minnesota law, if Wanzek prevails on its negligence claims, it would be able to collect the total amount of damages from Allstate if Allstate is found to be more than 50 percent responsible.  If Allstate is found to be less than 50 percent responsible, Wanzek will only be able to collect in proportion to the amount of fault assigned, unless Allstate and SiteTech are found to have acted in concert.[3]

North Dakota affords greater economic protection to a defendant, but burdens a plaintiff with the necessity of proving and collecting damages against every tortfeasor in order to be made whole.  Minnesota has the potential to allow a plaintiff to recover more than is numerically deserved from a particular defendant, but simplifies the litigation process for a plaintiff. "[S]ometimes different laws are neither better nor worse in an objective way, just different." Daley, 587 N.W.2d at 166 (quoting Jepson v. General Cas. Co. of Wisconsin, 513 N.W.2d 467, 473 (Minn. 1994)).  The Court need not decide which state has the better rule of law as there are other factors that favor application of Minnesota law and no factors that favor application of North Dakota law.

---

[3] Wanzek asserts Allstate and SiteTech "jointly" completed the project.  However, Wanzek has made no allegations, and there is no evidence in the record, that Allstate was acting with the intention of committing a tort or that Allstate ratified or adopted SiteTech's tortious acts for its benefit, so it is doubtful that the exception for concerted action would come into play in this case.

After considering the relevant state contacts in light of Leflar's choice-influencing considerations, Minnesota has the more significant contacts and interest with regard to the tort claims in this case.   Minnesota substantive law applies to the tort claims in this case.

> (2)   Whether Wanzek has a cognizable claim for breach of a duty of care for failing to supervise SiteTech.

A negligence claim requires proof of: "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of that duty being the proximate cause of the injury." Louis v. Louis, 636 N.W.2d 314, 318 (Minn. 2001).  The existence of a duty of care for a negligence claim is a legal question.  Funchess v. Cecil Newman Corp., 632 N.W.2d 666, 672 (Minn. 2001).  Generally, a person does not have a duty to protect others from harm caused by a third party's conduct.  Bjerke v. Johnson, 742 N.W.2d 660, 665 (Minn. 2007).  A duty can arise, however, if there is a special relationship between the parties and the risk of harm is foreseeable. Id.

Negligent supervision claims are premised on an employer's duty to control employees and prevent them from intentionally or negligently inflicting injury.  Johnson v. Peterson, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007).[4]  Minnesota has endorsed the view found in the RESTATEMENT (SECOND) OF TORTS § 414, which states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Thill v. Modern Erecting Co., 136 N.W.2d 677 (Minn. 1965); Sutherland v. Barton, 570 N.W.2d

---

[4] Wanzek alleges its damages were caused by Allstate's negligent hiring, training, and supervision of SiteTech's employees.  Minnesota does not recognize a claim for negligent training.  Johnson v. Peterson, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007).

1, 4 (Minn. 1997).  The Court is aware that the most recent publication is the RESTATEMENT (THIRD) OF TORTS, but neither party advances arguments under this version of the Restatement, and it does not appear that the Minnesota Supreme Court has not altered its law because of the newer version.[5]

Wanzek contends Allstate ought to be held liable for the damages caused by SiteTech because Allstate failed to use reasonable care in the exercise of control over SiteTech.  Allstate denies that it retained control over SiteTech's work.

In order to establish a duty to exercise control with reasonable care, a plaintiff must establish the defendant retained a certain level of control:

> It is not enough that [the company] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.  There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Sutherland, 570 N.W.2d at 5-6 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c).  The level of control retained by a contractor over a subcontractor is evidenced by several factors, including: (1) the plain meaning of the contract between parties, (2) the relationship and status of the parties, and (3) the conduct of the parties.

In this case the subcontract between SiteTech and Allstate does not demonstrate that Allstate retained control.  Under the terms of the Allstate/SiteTech agreement, the parties agreed

---

[5] RESTATEMENT (THIRD) OF TORTS § 56 states:
    (a)     An actor who entrusts work to an independent contractor owes no duty as to the manner in which the work is performed by the contractor, except as provided in Subsection (b).
    (b)     When an actor entrusts work to an independent contractor but retains control over any part of the work, the actor has a duty of reasonable care as to the exercise of the retained control.

that "time is of the essence with respect to the work to be performed", and that SiteTech would "perform all work with reasonable dispatch and diligence in order to complete the project within the time allotted." (Doc. #17-5, p. 4).  While Allstate retained the right visit and inspect the SiteTech job site "whenever [Allstate] deems it necessary", the other provisions of the agreement fail to demonstrate a right to direct or control the contracted work (Doc. #17-5, p. 6).

More specifically, attachment "A" to the subcontract agreement required all work to be done "in accordance with the specifications prepared by N/A". (Doc. #17-4).  As the subcontractor, SiteTech was required to furnish all labor, tools, and equipment.  Although Allstate was kept apprised of the project's progress through the use of email, photographs, and telephone calls, there is nothing in the record that indicates that Allstate was directing SiteTech's activities on the job site.  The subcontract agreement and attachment do not demonstrate retention of control by Allstate. The communication between Allstate and SiteTech simply reveals that Allstate was kept informed of the progress of the project–a not surprising development given the fact that the parties had agreed that time was of the essence.

The parties' relationship can also influence who had control over the project.  Both Allstate and SiteTech are professionals in the industry.  The undisputed evidence indicates both companies are knowledgeable enough to make determinations on how best to perform the project that gives rise to the claims in this case.  One could even say that SiteTech's extensive "hands-on" experience in this line of work gives it an "upper hand" in the industry.  In Sutherland, the Supreme Court of Minnesota found it significant that the contracted company was in a position to make decisions about how to perform electrical work in a manufacturing plant.  570 N.W.2d at 6-7. This responsibility of making important decisions about a project led the court to determine

24

the employing party had not retained the necessary control over the contracted party to create a duty under the RESTATEMENT (SECOND) OF TORTS § 414. Id.  The same rationale is applicable in this case.

Allstate considered SiteTech experienced at erecting and taking down towers. (Doc. #17-1, Dep. Walker, pp. 16, 52-57).  The subcontract required the removal of the tower using a gin pole.  Its customary in the industry to use a gin pole for towers over 300 feet.  Id. at p. 18.  Contrary to assertions made by Wanzek, the evidence before the Court indicates that the entire tower cannot be taken down with a gin pole.  Id. at pp. 18-20.  Thus, SiteTech's use of a crane to remove part of the tower is much ado about nothing.  Wanzek has not submitted any evidence to contradict Allstate's contention that a crane is always brought in at a certain point to complete the tower removal.  It is debatable in this case at what point the crane should have been used.  SiteTech believes the tower broke apart because of the crane operator's error.  Wanzek has retained a structural engineer, who has opined that if the tower had been removed in 100 foot sections by the crane, it would not have broken apart (Doc. #23-1, Report of Assadi).  Resolution of this issue does not change the undisputed facts that both Allstate and SiteTech were experienced in the tower removal business and SiteTech was left with the discretion on when to use a crane to complete the project.

Allstate's conduct while the project was ongoing also shows it relinquished control over the project.  This case is similar to Olson v. Pennzoil Co., 943 F.2d 881, 883-84 (8th Cir. 1991), in which an oil company ordered a test to be performed on an oil well with a written work order that specifically requested one of the three possible methods of testing.  After an employee was injured while performing the test in one of the two non-requested methods, the court held that a

request for the work to be performed in a specific manner did not amount to retaining control over the work.  "Rather, it contracted to have the work done in the customary manner and was concerned only with the final product.  As succinctly stated by the district court: 'Pennzoil asked for it.  Norther agreed to it.  A contract to do it was therefore executed.'" Id. at 884.

Here, Allstate asked SiteTech to remove the tower. SiteTech agreed to perform the work using its own materials, tools, and equipment. The mere fact that Allstate directed that the tower be dismantled with a gin pole does not amount to retaining control over the work.  Allstate was not so concerned with how the work was completed, but rather that it was completed.  An analysis of the evidence in the record plainly demonstrates that SiteTech controlled how much of the tower would be removed with a gin pole and how much of it would be removed with a crane.

Upon consideration of all of the evidence in the record, the Court finds that Wanzek has failed to produce sufficient evidence to raise a genuine issue of material fact on whether Allstate owed a duty under § 414 of the Restatement (Second) of Torts.  In summary, there is a lack of evidence demonstrating Allstate retained sufficient control over the project such that it owes a duty to Wanzek for SiteTech's alleged negligence.

> (3)     Whether Wanzek has a cognizable claim for negligence in failing to employ a competent and careful contractor.

While Minnesota has not directly endorsed the RESTATEMENT (SECOND) OF TORTS § 411, it has referenced it in at least two cases as persuasive authority.  See Larson v. Wasemiller, 738 N.W.2d 300, 306 (Minn. 2007); Lakeview Terrace Homeowners Ass'n v. Le Rivage, Inc., 498 N.W.2d 68, 71 (Minn. Ct. Ap. 1993).  Negligent hiring claims, like negligent supervision claims, are predicated on the theory of foreseeability.  Johnson, 734 N.W.2d at 277.  Negligent hiring

focuses on risks created by exposing the public to potential dangers.  Id. at 278.

Section 411 of the RESTATEMENT (SECOND) OF TORTS provides:

An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor

(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or

(b) to perform any duty which the employer owes to third persons.

Comment c to the Restatement explains that when contracting out professional work, it is not necessary to make steps to ensure that the contractor's reputation is good.  RESTATEMENT (SECOND) OF TORTS § 411 cmt c.   The fact that the entity exists as a professional company "is sufficient, unless the employer knows that the contractor's reputation is bad or knows of facts which should lead him to realize that the contractor is not competent." Id.

Allstate had previously worked with SiteTech, and SiteTech was in the business of erecting and dismantling cellular towers. Calandros testified that, before this incident and while working for SiteTech, he worked on approximately 45 to 60 jobs with Allstate (Doc. #17–3, Dep. Calandros, p. 108).  There is no evidence in the record that Allstate knew or had reason to know that SiteTech might perform negligently.  The mere fact that a subcontractor performs negligently does not raise a presumption that the contractor was negligent in its hiring.  Even if Minnesota would adopt § 411, Wanzek has failed to present any authority that Allstate had a duty to make further inquiry into SiteTech's competency under the facts present in this case.  Allstate is entitled to summary judgment on Wanzek's claim under RESTATEMENT OF TORTS § 411.

(4)    <u>Whether Wanzek has a cognizable claim because the removal of the tower was inherently dangerous work</u>.

The RESTATEMENT (SECOND) OF TORTS § 427 imposes a nondelegable duty on an employer if the fact finder determines the work involves a "special danger to others." Wanzek asserts that dismantling a cellular tower involves a recognizable risk inherent in the work.  Wanzek also notes that SiteTech did not provide safety plans or reports to Allstate, which it should have done under the terms of the subcontract.

Minnesota has cited the RESTATEMENT (SECOND) OF TORTS § 427, which provides:

One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

In determining the existence of a duty of care between Allstate and Wanzek, two issues are important: First, whether the removal of the tower constitutes a "special danger to others"; and second, whether Wanzek is included in the class of "others" the Restatement intended to protect.

*a.  whether the work is inherently dangerous*

Comment c to the Restatement provides a more detailed explanation of what is meant by "special" and "inherent" danger:

"The words 'inherently dangerous work' are used to indicate not only that the nature of the work itself, . . . is such that it can only be safely performed by the exercise of a special skill and care, . . . but also that the work, if unskillfully and carelessly done, involves a grave risk of serious bodily harm or death."

RESTATEMENT (SECOND) OF TORTS § 427 cmt. c.  The dismantlement and removal of a 500 foot tower is work that involves the potential for risk of serious bodily harm.  It is also work only

done by professionals and requires specialized skills and equipment to perform. There is

precedent in Minnesota to suggest that whether work is considered to be dangerous depends upon

the status of those performing the work:

> "[w]hile the nature of construction work carries with it a certain 'probability of
> injury' in the event of negligence, which could be said to 'inhere' in the work, it
> cannot be said, at least as to those employed in the building trades, that the danger
> is 'special' or the risks 'peculiar' except in an unusual case . . ."

Olson v. Kilstofte & Vosejpka, Inc., 327 F.Supp. 588 (D. Minn. 1971).

The risks inherent in dismantling a cellular tower are normal occupational hazards for

those active in the industry. Allstate and SiteTech are skilled in the trade. While SiteTech

questions the crane operator's ability, Wanzek holds itself out as experienced professionals,

emphasizing its industry leading safety record. http://www.wanzek.com/ . The operation of a

crane also requires specialized training and skills. Thus, Wanzek was an active participant in the

work that it seeks to label as "inherently dangerous."

The Court finds that neither the work nor the danger created in the process of completing

this project are, in any sense, peculiar or extraordinary. Likewise, the precautions that ought to

be used to guard against the dangers are not novel or unconventional. The cause of the damages -

whether created due to the height and/or structure of the tower, the frigid temperatures, the

manner in which the tower was rigged to the crane, the manner in which the crane operator

moved the tower, or any combination of these factors or others - can be attributed to ordinary and

customary negligence. Wanzek cannot meet the first requirement of § 427.

   *b.  whether Wanzek is a member of the protected class*

Even if Wanzek was able to establish the work was inherently dangerous, the duty created

by RESTATEMENT (SECOND) OF TORTS § 427 is intended to prevent a contractor from hiring out work that is inherently dangerous to a subcontractor in order to avoid liability to the *general public or adjoining property owners*.  Conover v. Northern States Power Co., 313 N.W.2d 397, 405 (Minn. 1981).  The employer's liability also extends to the employees of the independent contractor when the employer's own negligence causes the injury.  Vagle v. Pickands Mather & Co., 611 F.2d 1212, 1216 (8th Cir. 1979).

In Conover, the "others" who are protected by § 427 are defined as "third persons who might come upon or about the jobsite [sic] and be injured." 313 N.W.2d 404.  Wanzek does not fall into this category of "others."  Wanzek contracted to allow use of its crane on the job site, delivered the crane, and provided a crane operator.  Wanzek was on the job site purposefully and was compensated for the use of its equipment and skilled crane operator.

Wanzek is not a member of the class of persons meant to be protected by RESTATEMENT (SECOND) OF TORTS § 427.  Wanzek has failed to meet the second requirement for a claim under § 427.  Based on this record, no issue of material fact exists on Wanzek's claim under § 427; therefore, Allstate is entitled to summary judgment.

## VI.  DECISION AND ORDER

There is contradictory evidence in the record on whether Allstate's conduct is sufficient to conclude SiteTech was acting as an ostensible agent of Allstate when it rented the crane from Wanzek.  Because genuine issues of material fact preclude summary judgment on Wanzek's breach of contract claim, Allstate is not entitled to summary judgment.

Minnesota law applies to the tort claims alleged in this case.  Wanzek has failed to present sufficient evidence or disputed facts in order to meet the requirements necessary for its

negligence claims.  Thus, Allstate is entitled to summary judgment on these claims.

Allstate's motion for summary judgment is **GRANTED in part** and **DENIED in part**.

Wanzek's motion for summary is **DENIED**.

**IT IS SO ORDERED**.

Dated this 25th day of June, 2013.

/s/ Ralph R. Erickson
Ralph R. Erickson, Chief Judge
United States District Court